IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VERONICA ENRIQUEZ; SHEERCE MULLINS; ANGELINA SANCHEZ; NICOLE SKOPIS, | ) ) ) ) | |
| | ) | Case No. 06 C 3135 |
| Plaintiffs, | ) | |
| | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| UNITED STATES CELLULAR CORPORATION, a Delaware corporation; CLAYTON WELCH, individually and in capacity as an employee of U.S. Cellular, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Veronica Enriquez ("Enriquez"), Sheerce Mullins ("Mullins"), Angelina Sanchez ("Sanchez") and Nicole Skopis ("Skopis") (collectively "Plaintiffs") filed suit against United States Cellular Corporation ("USCC") and Clayton Welch ("Welch") (collectively "Defendants"). Plaintiffs allege sex discrimination in the form of sexual harassment[1] and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") against USCC. Additionally, Sanchez alleges intentional infliction of emotional distress under Illinois common law against Welch

_____

[1] In their Complaint, Plaintiffs allege they "were subjected to sex discrimination, sexual harassment, and a sexually hostile work environment by their employer." (2d Am. Compl. ¶ 1.) However, the parties only address sexual harassment in their briefs. Therefore, the Court has interpreted Plaintiffs' Title VII claim to be sex discrimination in the form of sexual harassment, based upon a hostile work environment. *DeClue v. Central Ill. Light Co.*, 223 F.3d 434, 437 (7th Cir. 2000) ("Sexual harassment is the form of sex discrimination in the terms or conditions of employment that consists of efforts either by coworkers or supervisors to make the workplace intolerable or at least severely and discriminatorily uncongenial to women ('hostile work environment' harassment) . . . . It is a form of, rather than a synonym for, sex discrimination.).

1

and USCC.  Defendants moved for summary judgment as to all claims.  For the reasons set forth below, their motions for summary judgment are granted.

## STATEMENT OF UNDISPUTED FACTS

### I.  Background

USCC maintains a wireless telecommunications network and it also operates retail stores that sell cellular telephones and related items.  Plaintiffs worked at the USCC retail store in Bedford Park, Illinois.  (Pl. 56.1 Resp. ¶ 1.)[2]  Enriquez worked as a part-time wireless consultant for USCC beginning November 8, 2004.  (Pl. 56.1 Resp. ¶ 8.)  Enriquez reported directly to Sales Supervisor Samuel Vallez ("Vallez").  (Pl. 56.1 Resp. ¶ 9.)  Skopis became a part-time cashier/greeter for USCC on May 2, 2005.  (Pl. 56.1 Resp. ¶ 16.)  Skopis asked Welch several times to move her to a sales

---

[2]  Citations to "Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts" have been abbreviated to "Pl. 56.1 Resp."  Likewise, citations to "Defendants' Joint Response to Plaintiffs' Combined Statement of Additional Facts" have been abbreviated to "Def. 56.1 Resp."  The Court notes with considerable displeasure that the parties have failed to comply with L.R. 56.1.  That rule allows parties to file a statement of undisputed material fact consisting of short numbered paragraphs.  Ignoring that obligation, each side has filed numerous lengthy paragraphs relating to a variety of unrelated or irrelevant topics that one cannot characterize as "short."  Making matters worse, several statements within the paragraphs misrepresent the record.  Accordingly, the parties forced the Court to wade through convoluted, noncompliant Local Rule 56.1 submissions.

Nonconformity with the Local Rules and the standing orders of the Court is not without consequence.  *Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 U.S. Dist. LEXIS 7569, at *8 (N.D. Ill. Apr. 29, 2004) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1).  The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1."  *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)).  "A district court does not abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed."  *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005).  Accordingly, this Court will not consider portions of the parties' submissions that do not contain proper support from the parties' citations to the record.

Moreover, Plaintiffs' Combined Statement of Additional Facts contains inadmissible hearsay throughout the submission.  Therefore, even if Plaintiffs had complied with L.R. 56.1, much of the evidence would have been inadmissible.  *See Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 534 (7th Cir. 2003) (noting that hearsay statements are not competent evidence that may be used to oppose a motion for summary judgment).  Accordingly, this Court will not consider portions of Plaintiffs' Combined Statement of Additional Facts that contain inadmissible hearsay.  *See Bradley v. Work*, 154 F.3d 704, 707-08 (7th Cir. 1998) (finding district court did not abuse its discretion by striking portions of L.R. 56.1 statement when the submissions that did not conform with local rules and contained inadmissible hearsay).

position at the store, but never submitted an internal application form pursuant to USCC's guidelines for promotions and transfers. (Pl. 56.1 Resp. ¶¶ 19-20.) USCC hired Sanchez as a part-time cashier/greeter on September 6, 2005. (Pl. 56.1 Resp. ¶ 11.) Sanchez reported directly to Vallez until October 2005, when she began to report to Welch. (Pl. 56.1 Resp. ¶ 12.) She held that same position as a full-time employee beginning November 1, 2005. (Pl. 56.1 Resp. ¶ 12.) On October 10, 2005, USCC hired Mullins as a full-time wireless consultant. (Pl. 56.1 Resp. ¶ 21.) Welch worked as the Bedford Park Store Manager from October 2005 through April 17, 2006 and reported to the Area Sales Manager, Noel Hornsberry ("Hornsberry"). (Pl. 56.1 Resp. ¶ 3.) Associate Relations Manager Tracey Banks-Giles ("Banks-Giles") provided human resources support to Hornsberry. (Pl. 56.1 Resp. ¶ 3.)

When the Plaintiffs began their employment with USCC, they received a copy of the USCC Associate Handbook which contained the company's Harassment Policy. (Pl. 56.1Resp. ¶¶ 10, 13, 18, 23.) They also had access to USCC's Harassment Policy via the company's intranet site and knew that they could bring complaints of workplace discrimination, harassment and/or retaliation to company leadership, including human resources representatives, human resources executives and other USCC executives. (Pl. 56.1 Resp. ¶¶ 10, 13, 18, 23.)

II. Welch's Behavior

a. Towards Enriquez

Enriquez claims that Welch sexually harassed her beginning in November 2005. (Pl. 56.1 Resp. ¶ 24.) At that time, she asked Welch for a change in her work schedule. (Pl. 56.1 Resp. ¶ 25.) In response, Welch asked her to "lay across [his] desk in some lingerie," laughed, and granted her request. (*Id.*) Around that same time, Welch began to make comments regarding the physical

3

appearances of women entering the Bedford Park store. (Pl. 56.1 Resp. ¶ 29.) On several occasions, he said "she's got a nice ass," "damn, she's fine," and "if you have a nice ass you can work at U.S. Cellular" when female customers entered the store. (*Id.*) At some later time, Welch sent Enriquez text messages such as "those black pants look good on your ass," and "your scent is still in my office" when she wore perfume. (Pl. 56.1 Resp. ¶ 26.) Additionally, Welch made several comments to her, including "you have a nice body." (Pl. 56.1 Resp. ¶ 27.) Enriquez overheard Welch tell Vallez that he "can't wait for [a co-worker] to wear that skirt again because she looked really good in it." (Pl. 56.1 Resp. ¶ 30.) In approximately December 2005, Welch attempted to kiss Enriquez while she was in his office. (Pl. 56.1 Resp. ¶ 28.) She immediately left his office. Welch later called her to apologize if he made her feel uncomfortable. (*Id.*) When the store ordered new uniform shirts for its employees in March 2006, Welch told her that her "tits are going to look nice in that shirt." (Pl. 56.1 Resp. ¶ 27.) After each incident, Enriquez returned to work, completed her shift, and continued to work with Welch on a daily basis. (Pl. 56.1 Resp. ¶¶ 26-28.)

### b. *Towards Sanchez*

Sanchez claims that Welch sexually harassed her beginning in February 2006. (Pl. 56.1 Resp. ¶ 32.) In February 2006, Welch told her "you have got a nice ass." (Pl. 56.1 Resp. ¶ 33.) In response, Sanchez asked him not to say that again. (*Id.*) Around that same time, he told her that her "shirt looked nice and tight" and he asked to see her breasts on two occasions. (Pl. 56.1 Resp. ¶ 34.) She responded by telling him to stop treating her with disrespect. (*Id.*) After that, Welch asked to see her breasts several more times. (*Id.*) In March 2006, Welch asked her "when are you going to let me lick your tits?" (Pl. 56.1 Resp. ¶ 35.) Around that same time, Welch told Sanchez that he "took a bottle of water, and [he] showed [Mullins] the best time of her life." (Pl. 56.1 Resp. ¶ 36.)

Sanchez heard Welch make comments to other male employees when female customers entered the store, such as "damn, look at her ass. We need to get her to work here." (Pl. 56.1 Resp. ¶ 37.) When female job applicants entered the store, Welch would ask Sanchez "how does [the applicant] look?" (*Id.*) In late March 2006, Sanchez had a disagreement with Welch regarding four hours of sick time. (Pl. 56.1 Resp. ¶ 38.) Welch accused her of stealing the time, and notified her that such behavior could constitute grounds for termination. (*Id.*) Sanchez responded to him, "what, I wouldn't let you see my tits, and now you're trying to fire me." (Def. 56.1 Resp. ¶ 16.) Welch told Sanchez that he "could have her taken care of" because he belonged to the Freemasons. (Def. 56.1 Resp. ¶ 8.) After that incident, he sent her text messages stating, "And u should b careful what u say behind my back because people tell me [sic]" and "I don't disrespect women and don't threaten my job that is not wise this is what happens when u don't mind ur own bus [sic]." (*Id.*) Sanchez did not lose her job over the incident, but after that, she claims that she did not feel comfortable being around Welch. (Pl. 56.1 Resp. ¶¶ 38, 70.) Nonetheless, after each incident with Welch, Sanchez returned to work, finished her shift, and continued to work with Welch on a daily basis. (Pl. 56.1 Resp. ¶ 35.)

### c. Towards Skopis

Skopis claims that Welch sexually harassed her beginning in November 2005. (Pl. 56.1 Resp. ¶ 40.) Around that time, he told Skopis that she was pretty. (Pl. 56.1 Resp. ¶ 41.) He then called Skopis into his office to tell her that he wanted to go out for drinks with her and get her drunk so he could take advantage of her and have her do things with him that would probably cause trouble for him. (Pl. 56.1 Resp. ¶ 42.) He then asked her if she felt uncomfortable. She responded that she did not. (*Id.*) Beginning in November 2005, she overheard Welch make comments regarding female customers in the store several times a week. (Pl. 56.1 Resp. ¶ 46.) For example, Skopis overheard

Welch say, "Wow, look at her.  She is pretty.  Look at her body.  Get her an application."  (*Id.*).  In December 2005, Skopis told Welch that she "will do anything around here" if he would permit her to leave her shift early on that day.  (Pl. 56.1 Resp. ¶ 43.)  He then pulled her into his office and asked, "So what do you mean by anything?  Are you serious when you say anything, you will do anything?"  (*Id.*)  She responded, "I meant anything work-related.  You are taking it the wrong way."  (*Id.*)  Welch replied, "Oh, so now you are just teasing me" and allowed her to leave her shift early.  (*Id.*)  In rejecting Welch's advances, Skopis reminded Welch that he had a wife, to which he responded, "don't play the marriage card with me" and "it's not [my wife's] business what I do outside my marriage."  (Def. 56.1 Resp. ¶ 1.)  After each incident with Welch, Skopis returned to work and finished her shift without any trouble.  (Pl. 56.1 Resp. ¶ 42.)

Also in December 2005, Welch and Skopis attended a Christmas party hosted at a co-worker's house.  (Pl. 56.1 Resp. ¶ 44.)  At the party, Welch whispered to Skopis, "You look good enough to eat right now."  (Pl. 56.1 Resp. ¶ 44.)  Later that night, when Skopis sat on the edge of a pool table, Welch approached her, pushed her legs open, and picked her up to dance, holding her with her legs around his waist for approximately thirty seconds.  (*Id.*)  While he held her, Skopis hit him and told him to let her down.  (*Id.*)  He then placed her down when he realized that she felt uncomfortable.  (*Id.*)  After the Christmas party, Welch sent Skopis several text messages.  (Pl. 56.1 Resp. ¶ 45.)  The first message stated that Skopis "had a bad boy for a boss and she didn't know the things he could do with her."  (*Id.*)  The second message stated that Welch "was going to get himself into trouble for talking to her like that."  (*Id.*)  In the third message, Welch told her that "he liked it when she wore her hair down because that does it for him."  (*Id.*)  Skopis did not speak to him regarding the messages.  (*Id.*)  After the Christmas party, Welch told Skopis to speak to Vallez about her desire to

switch into a sales position.  (Pl. 56.1 Resp. ¶ 19.)  However, she did not submit an approved internal application for the position, which USCC requires for internal promotions and transfers.  (Pl. 56.1 Resp. ¶ 20.)

### d. Towards Mullins

Mullins alleges that Welch sexually harassed her beginning in October 2005.  (Pl. 56.1 Resp. ¶ 49.)  In February 2006, she bought a Valentine's Day present for Welch.  (Pl. 56.1 Resp. ¶ 52.)  Also in February 2006, he sent her a text message telling her, "Let's elope to the Bahamas."  (Pl. 56.1 Resp. ¶ 50.)  Mullins thought the message was funny.  (*Id.*)  Later that month, Welch sent her a message to "meet [him] at this hotel."  (*Id.*)  Later, when she did not answer his phone calls, he sent her two messages saying, "You might as well call me back or else."  (*Id.*)  Another time, Welch called her and said, "Let's go out.  When we [sic] going to hook up?"  (Pl. 56.1 Resp. ¶ 51.)  On two occasions, Welch attempted to kiss Mullins in his office.  (Pl. 56.1 Resp. ¶ 52.)  On two other occasions, Welch lifted Mullins by the outside of her thighs and called her "juicy."  (Pl. 56.1 Resp. ¶ 53.)

### e. Miscellaneous

At some point after Plaintiffs rejected Welch's advances, Mullins, Sanchez and Skopis had their work schedules changed so that they would have to work nights.  (Def. 56.1 Resp. ¶ 12.)  However, they were not the only USCC employees at the Bedford Park store that experienced schedule changes.  (Pl. 56.1 Resp. ¶ 68.)  Rather, Skopis stated that "everyone had to switch up their schedule [to work] days, nights [or] weekends sometimes."  (*Id.*)  Additionally, at some point before Plaintiffs reported Welch's behavior internally, Welch told Mullins that she was fired for wearing a USCC-issued Chicago White Sox shirt to work.  (Pl. 56.1 Resp. ¶ 69.)  Immediately after that, he

told Mullins that she was not fired. (*Id.*) After this incident, Mullins continued to work for USCC at the Bedford Park store. (Pl. 56.1 Resp. ¶¶ 69, 62.)

During a store meeting in March 2006, Welch told employees that complaining to Hornsberry would be useless because Welch "is [Hornsberry's] boy" and Hornsberry "has his back." (Pl. 56.1 Resp. ¶ 65.) During that same meeting, he told the Bedford Park employees that what happens in the Bedford Park store stays in the Bedford Park store. (*Id.*) However, Welch did not make those comments in connection with a discussion of sexual harassment reporting procedures. (*Id.*)

### III. Plaintiffs' Behavior

At some point during their employments with USCC, Enriquez and Skopis attended a strip club together. (Pl. 56.1 Resp. ¶ 76.) Skopis did not feel offended at the strip club, and she even gave one of her male co-workers a "stripper pole" for his twenty-first birthday. (*Id.*) Sanchez has exchanged text messages that contained sexual jokes with her co-workers. (Pl. 56.1 Resp. ¶ 77.) On one such occasion, she received a text message containing images of cartoon characters engaging in oral sex. (*Id.*) That message did not make Sanchez feel uncomfortable, and she forwarded the message to Mullins. (*Id.*) Mullins did not feel offended by the images, either. (*Id.*) On another occasion, Sanchez shared a text message with her co-workers that included images of nude people "gyrating" on top of each other. (Pl. 56.1 Resp. ¶ 78.) In March 2006, Sanchez sent a picture of a woman's buttocks to Vallez with the message, "Here you go. You can take it wherever you go. Ha, ha, ha." (Pl. 56.1 Resp. ¶ 79.) On another occasion, Mullins shared pictures of herself with Sanchez, including nude pictures of Mullins, as well as pictures featuring Mullins wearing lingerie. (Pl. 56.1 Resp. ¶ 80.) Mullins claims that she did not share the images with Welch. (*Id.*) Nevertheless, Welch had somehow obtained copies of the pictures. (*Id.*)

On Sunday, April 2, 2006, Sanchez reported Welch's behavior to Hornsberry, saying, "I am being harassed by Clayton [Welch], and I can't take it no [sic] more."  (Pl. 56.1 Resp. ¶ 55.)  Because Hornsberry was not available to handle Sanchez's claim on that day, he offered to get back to her, and she agreed.  (*Id.*)  A few days later, Hornsberry called Sanchez and asked her to compose an email to him that contained all of her allegations, but she refused.  (*Id.*)  On April 5, 2006, Enriquez and Skopis met with a lawyer to discuss Welch's behavior.  (Pl. 56.1 Resp. ¶ 56.)  Sanchez and Mullins met with the same lawyer the next day.  (*Id.*)  On April 7, 2006, Sanchez called the USCC ethics line and reported Welch's behavior.  (*Id.*)  On April 8, 2006, Sanchez left a message regarding Welch for Banks-Giles, and Banks-Giles set up a meeting to speak with Sanchez in person.  (*Id.*)  Sanchez then met with Hornsberry and Banks-Giles on April 12, 2006.  (Pl. 56.1 Resp. ¶ 57.)  Sanchez received the rest of that day off, with pay, and then went on vacation until April 25, 2006.  (*Id.*)  After Sanchez met with Banks-Giles and Hornsberry, Enriquez called Banks-Giles to report Welch.  (Pl. 56.1 Resp. ¶ 58.)  The following week, Banks-Giles and Hornsberry met with Enriquez to discuss her complaints in person.  (Pl. 56.1 Resp. ¶ 59.)  After the meeting, Enriquez never worked with Welch again, and she admits that he did not sexually harass her after she complained.  (Pl. 56.1 Resp. ¶ 60.)

Skopis and Mullins never filed complaints with USCC regarding Welch.  (Pl. 56.1 Resp. ¶¶ 62, 63.)  However, they each met with Banks-Giles and Hornsberry as a part of USCC's investigation into Welch's conduct.  (Pl. 56.1 Resp. ¶¶ 62, 63.)  During the course of the investigation, Hornsberry and Banks-Giles conducted between twenty five and thirty interviews.  (Pl. 56.1 Resp. ¶ 64.)  As a

result of USCC's investigation, Hornsberry suspended Welch on April 12, 2006, and the company terminated Welch's employment on April 17, 2006. (*Id.*)

When Sanchez returned from her vacation on April 25, 2006, she transferred from the Bedford Park store to USCC's Crestwood, Illinois retail store. (Pl. 56.1 Resp. ¶ 15.) She had previously requested a transfer to USCC's Oak Lawn, Illinois retail store, but Hornsberry assigned her to the Crestwood store. (*Id.*) Also on April 25, 2006, Sanchez's employee status changed in the USCC employee database. (Def. 56.1 Resp. ¶ 10.) Although Sanchez remained a full-time employee at USCC, the computer system classified her as a part-time employee. (*Id.*) Because the system reflected a change in her status, Sanchez received notification that her benefits, including health insurance, had ended. (Pl. 56.1 Resp. ¶ 67.) Sanchez called the USCC Human Resources department to straighten the situation out. (*Id.*) She now admits that USCC corrected its employee database to reflect her status as a full-time employee, that she "never lost anything in terms of insurance," that the mix up "didn't affect her in any way," and that she "suffered no harm" as a result of the temporary change of her employment status in the computer system. (*Id.*)

In May 2006, Sanchez received a referral to a psychiatrist after telling her physician that she felt depressed. (Pl. 56.1 Resp. ¶ 71.) However, despite the referral, she did not see a psychiatrist. (*Id.*) In late June 2006, Sanchez received the transfer to USCC's Oak Lawn retail store that she had requested in November 2005. (Pl. 56.1 Resp. ¶ 15.) Beginning in July 2006, Sanchez began to experience signs or symptoms of depression. (Pl. 56.1 Resp. ¶ 74.) On July 11, 2006, Sanchez went to South Suburban Hospital because she experienced chest pains and felt "really down" because her former co-workers from USCC's Crestwood store believed that she caused Welch's termination for no reason, and also because she argued a lot with her husband. (Pl. 56.1 Resp. ¶ 72.) After checking

into South Suburban Hospital, she was involuntarily committed to a mental institution, Methodist Psychiatric Institution, for one night. (*Id.*) At Methodist, she told her doctor that she had no issues at work, and that she had been admitted to the institution by mistake. (Pl. 56.1 Resp. ¶ 73.) Her doctor provided her with several resources for support and counseling, but she did not seek further mental health treatment at any time. (*Id.*)

After Plaintiffs met with Hornsberry and Banks-Giles, other USCC employees blamed Plaintiffs for Welch's termination. (Pl. 56.1 Resp. ¶ 66.) Enriquez overheard one of her co-workers tell another co-worker that "those bitches got Clayton [Welch] fired." (*Id.*)

On May 9, 2006, all four Plaintiffs filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), relating to "sexual harassment and hostile work environment." (Pl. 56.1 Resp. ¶ 83; 2d Am. Compl. ¶ 22.) On May 24, 2006, the EEOC issued "Right to Sue Letters" to each of the Plaintiffs. (Compl. Ex. A.) On June 7, 2006, Plaintiffs filed their Complaint in this Court. (Pl. 56.1 Resp. ¶ 83.) On October 16, 2006, Plaintiffs filed their Second Amended Complaint, alleging that they "have been discriminated against due to their sex - female, subjected to pervasive sexual harassment and hostile work environment [sic], and retaliated against for complaining of discrimination" by USCC, in violation of Title VII. (Pl. 56.1 Resp. ¶ 85; 2d Am. Compl. ¶¶ 3, 12-23.) Plaintiffs also alleged claims of intentional infliction of emotional distress ("IIED") against USCC and Welch. (Pl. 56.1 Resp. ¶ 85; 2d Am. Compl. ¶¶ 24-27.) On July 26, 2007, all Plaintiffs except Sanchez dismissed their IIED claims against both USCC and Welch, with prejudice. (Pl. 56.1 Resp. ¶ 85.)

**STANDARD OF REVIEW**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## **DISCUSSION**

### I.  Exhaustion of Administrative Remedies

As a preliminary matter, the Court must determine whether Plaintiffs exhausted their administrative remedies before filing this lawsuit. "Generally, a Title VII plaintiff may bring only those claims that were included in her EEOC charge . . . ." *McKenzie v. Ill. Dep't. of Transp.*, 92

F.3d 473, 481 (7th Cir. 1996). USCC claims that Plaintiffs did not exhaust their administrative remedies because they initially filed their charges of discrimination with the EEOC, rather than the Illinois Department of Human Resources ("IDHR"), and a result, it is entitled to summary judgment on all Title VII claims. It also claims that Plaintiffs did not exhaust their administrative remedies with respect to their retaliation claims because their charges of discrimination did not refer to retaliation. In both of its arguments, USCC misstates the applicable law.

*A. Filing charges of discrimination with the EEOC*

USCC asserts that Plaintiffs should have filed charges of discrimination with the IDHR, waited until either the IDHR terminated its proceedings or sixty days had passed, and then filed the charges with the EEOC. *See* 42 U.S.C. § 2000e-5(c).[3] USCC correctly points out that when a state has its own equal employment opportunity agency, as Illinois does, in order to bring a federal lawsuit under Title VII, the plaintiff must: 1) file a charge with the state agency at least sixty days before filing with the EEOC; and 2) receive a "right to sue letter" from the EEOC. *Doe v. Oberweis Dairy*, 456 F.3d 704, 708 (7th Cir. 2006). However, the inquiry does not end there, because filing a charge with the EEOC alone can satisfy the requirements of 42 U.S.C. § 2000e-5(c).

Title VII gives states an opportunity to address the discrimination claims of their citizens before the federal government can become involved. *See EEOC v. Commercial Office Prods.*, 486 U.S. 107, 117-18 (1988). However, some states, including Illinois, "have chosen to forego their statutory right to initially process employment discrimination claims in certain circumstances. They

---

[3] In relevant part, § 2000e-5(c) reads: "In the case of an alleged unlawful employment practice occurring in a State . . . which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice . . . no charge may be filed [under this section] by the person aggrieved before the expiration of sixty days after proceedings have been commenced under State or local law, unless such proceedings have been earlier terminated . . . ."

have done so by entering into so-called 'workshare agreements' with the EEOC in which they waive their exclusive right under Title VII to initially process certain claims and categorically defer first rights over those claims to the EEOC." *Hong v. Children's Memorial Hosp.*, 936 F.2d 967, 969 (7th Cir. 1991). Accordingly, through the workshare agreement, Illinois has ceded its jurisdictional prerogative to the EEOC. *Id.* at 971. As a result, either the IDHR or the EEOC has the initial jurisdiction to review a discrimination complaint. *See Marlowe v. Bottarelli*, 938 F.2d 807, 809 (7th Cir. 1991). The workshare agreement between IDHR and the EEOC protects plaintiffs from engaging "in the futile exercise of actually filing with the IDHR and then waiting for state termination or for sixty days to elapse when worksharing agreements provide, in the alternative, for direct filing with the EEOC and both initiation and termination of the state's interests pursuant to a prearranged waiver." *Hong*, 936 F.2d at 970. Once a complainant files a charge of discrimination with the EEOC, the workshare agreement has the effect of simultaneously initiating and terminating state proceedings. *Marlowe*, 938 F.2d at 814. Accordingly, the workshare agreement allows litigants seeking relief under Title VII to bypass the IDHR and proceed directly to the EEOC. Therefore, filing a charge of discrimination with the EEOC alone satisfies the prerequisite that plaintiffs exhaust their state administrative remedies before bringing an action under Title VII in federal court.

Here, Plaintiffs filed their charges of discrimination with the EEOC on May 9, 2006. That filing had the effect of simultaneously initiating and terminating state proceedings as of that same date. Plaintiffs then received their "Right to Sue Letters" on May 24, 2006. Therefore, they have fulfilled the prerequisites to bringing a Title VII suit. Accordingly, USCC's motion for summary judgment due to failure to exhaust administrative remedies is denied.

*B. Exhaustion of administrative remedies with respect to retaliation claims*

14

USCC also argues it is entitled to summary judgment on Plaintiffs' retaliation claims because they did not raise those claims in their charges of discrimination with the EEOC.

As previously stated, "[g]enerally, a Title VII plaintiff may bring only those claims that were included in her EEOC charge . . . ." *McKenzie*, 92 F.3d 481. However, an exception exists for claims that are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Jenkins v. Blue Cross Mut. Hosp. Ins.*, 538 F.2d 164, 167 (7th Cir. 1976) (en banc), *cert. denied*, 429 U.S. 986 (1976). A claim falls under that exception when "there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Cheek v. W. and S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). When a plaintiff claims retaliation after filing a charge with the EEOC, "a separate administrative charge is not prerequisite to a suit complaining about retaliation for filing the first charge." *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989), *superseded on other grounds by statute as stated in Rush v. McDonald's Corp.*, 966 F.2d 1104, 1119-20 (7th Cir. 1992); *see also McKenzie*, 92 F.3d at 472-73 (noting that when the alleged retaliation arose after the charge of discrimination had been filed, "only a single filing [is] necessary to comply with the intent of Title VII; a double filing would serve no purpose except to create additional procedural technicalities.").

USCC, in arguing that Plaintiffs' EEOC charges of sexual harassment and sex discrimination do not encompass their retaliation claims, relies on the Seventh Circuit's observation that "[n]ormally, retaliation, sex discrimination, and sexual harassment charges are not like or reasonably related to one another to permit an EEOC charge of one type of wrong to support a subsequent civil suit for another." *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003). However, that

case involved a much different situation than the one presently before this Court. In *Sitar*, the plaintiff first complained of sexual discrimination and hostile work environment to her employer in December 1997. *See id.* at 724. After she made that complaint, her employer terminated her on March 27, 1998. *Id.* at 725. Then, she filed a charge with the EEOC that only mentioned her discharge. *Id.* After receiving her "right to sue letter," she filed suit against her employer for retaliation, sex discrimination and sexual harassment. *Id.* at 726. The Seventh Circuit found that because the plaintiff did not first raise her claims for sex discrimination and sexual harassment in her EEOC charge, she could not pursue those claims at all, noting that "this is not the unusual case in which a single *retaliation* charge will support a broader range of claims." *Id.* (emphasis added). The *Sitar* Court then noted that because the plaintiff's sex discrimination and sexual harassment claims necessarily arose before she filed for her discharge, in order to pursue those claims in federal court, she needed to raise them first in her EEOC charge. *Id.* at 726-27.

Here, unlike in *Sitar*, Plaintiffs do not attempt to bootstrap their sex discrimination claims under a retaliation charge filed with the EEOC. Instead, they filed EEOC charges complaining of sex discrimination and sexual harassment. Any alleged retaliation that does not appear in their EEOC charges necessarily arose after they filed the charges. While *Sitar* illustrates that a *retaliation* charge will not typically support additional claims for harassment and discrimination, the Seventh Circuit has found that EEOC charges for *discrimination* or *harassment* will support claims for retaliation. *See McKenzie*, 92 F.3d at 472-73; *Malhotra*, 885 F.2d at 1312. Because a reasonable relationship exists between the allegations of discrimination and harassment in Plaintiffs' EEOC complaint and the retaliation claims in Plaintiffs' Complaint, Plaintiffs may maintain their retaliation claims in this action. Therefore, USCC is not entitled to summary judgment with respect to Plaintiffs' retaliation

16

claims based on the argument that Plaintiffs did not raise retaliation in EEOC charges before bringing this case.

II.  Title VII claims

The Court now turns to Plaintiffs' substantive claims of sex discrimination in the form of sexual harassment and retaliation arising under Title VII.

*A.  Sex Discrimination in the Form of Sexual Harassment*

Under Title VII, employers with more than fifteen employees may not "discriminate against any individual with respect to his . . . conditions . . . of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  As previously mentioned, sexual harassment is a form of sex discrimination.  *See DeClue*, 223 F.3d at 437.  To establish a prima facie case of sexual harassment based upon a theory of hostile work environment, a plaintiff must demonstrate that "she was 1) subjected to unwelcome sexual conduct, advances, or requests; 2) because of her sex; 3) that were severe or pervasive enough to create a hostile work environment; and 4) that there is a basis for employer liability."  *Erickson v. Wisc. Dep't of Corrections*, 469 F.3d 600, 604 (7th Cir. 2006).  Merely offensive conduct does not give rise to liability, for "Title VII is not a civility code."  *Patton v. Keystone RV Co.*, 455 F.3d 812, 815 (7th Cir. 2006).  "Occasional vulgar banter, tinged with sexual innuendo, of coarse and boorish workers" does not establish a hostile work environment.  *Id.* at 816; *see also Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 858 (7th Cir. 1999) ("It is not enough that a [co-worker] . . . fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor.").

To create a hostile working environment, the harassment must be "both subjectively and objectively so severe or pervasive as to alter the conditions of her employment and create an abusive working environment."  *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004).  To be actionable, the working environment must be "one that a reasonable person would find hostile or

abusive, and one that the victim in fact did perceive to be so." *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). "In determining whether the environment was objectively hostile, a court must consider all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Id.* at 975-76; *see also* 29 C.F.R. § 1604.11(a) (defining sexual harassment as "verbal or physical conduct of a sexual nature" that unreasonably interferes with the individual's work performance). "In the typical case, it is a combination of severity and frequency that reaches the level of actionable harassment." *Patton*, 455 F.3d at 816. To determine if Plaintiffs experienced a severe or pervasive hostile work environment at USCC's Bedford Park retail store, the Court must review each Plaintiff's claim individually.

### i. Enriquez

Enriquez essentially claims that she experienced a severe or pervasive hostile work environment over the course of five months based upon three different kinds of harassment: 1) comments that Welch made to Enriquez about Enriquez; 2) comments that Welch made about customers that Enriquez overheard; and 3) Welch attempting to kiss Enriquez in his office.

Welch made several inappropriate comments to Enriquez while he managed her. On different occasions, he asked her to lie across his desk while wearing lingerie, told her that she has a nice body, that her pants looked "good on her ass," and that her "tits are going to look nice" in her new USCC uniform. On many other occasions, Enriquez overheard Welch state that a customer "is fine" or "has a nice ass." Welch did not direct these comments at Enriquez; rather, he commented on the store's customers. Additionally, the record shows that Welch attempted to kiss Enriquez while she was in

his office. As Enriquez turned away to refuse his kiss, Welch gave her a short peck that grazed against her skin.

Spread out over a few months, offensive comments about a co-worker, comments about other people and a brief instance of physical contact may not create an objectively hostile work environment. *See, e.g., Gleason v. Mesirow Fin., Inc.*, 1183 F.3d 1134, 1144-45 (7th Cir. 1997) (finding no hostile work environment when co-worker referred to female customers as "bitchy" or "dumb," ogled other female employees, flirted with the plaintiff's female relatives, and commented on the size of another co-worker's breasts); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (stating that several offensive sexual gestures and comments spread out over several months were not sufficient to demonstrate hostile work environment, noting "[t]he infrequency of the offensive comments is relevant to an assessment of their impact."); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (finding that no hostile work environment existed when co-worker put his arm around the plaintiff, placed "I love you" signs in her work area, placed his hand on her shoulder numerous times, attempted to kiss her once in a bar, and may have attempted to kiss her twice at the office); *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993) (holding that an unwanted rubbing of plaintiff's thigh, a forced kiss and an attempted grab by a co-worker were not enough to create a hostile work environment).

Over five months, Welch directed most of his comments towards USCC's customers, rather than towards Enriquez. While the Court considers those comments in objectively evaluating the severity of Enriquez's work environment at USCC, the comments about customers that Enriquez overheard did not have the same impact as the comments Welch made about her. *Gleason*, 118 F.3d at 1144 ("Such incidents – directed at others and not the plaintiff – do have some relevance in

demonstrating the existence of a hostile work environment.  However . . . the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff.") (citations omitted).

With respect to Welch's attempt to kiss Enriquez in his office, "intimate or crude physical acts, including a kiss, "may be considered insufficiently abusive to be described as 'sever' when they occur in isolation." *Patton*, 455 F.3d at 816.  Nonetheless, "there may be circumstances surrounding a kiss on the lips that distinguish it greatly from the kind of inappropriate, but not egregious physical contact that is insufficient, in isolation to create a hostile work environment." *Id.*  For example, one kiss could create a hostile environment by itself when the "co-worker did not simply steal a quick kiss from [the plaintiff's] lips, but, holding her face in his hands, forced his tongue into her mouth." *Id.* (*quoting Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 809 (7th Cir. 2000)).  Here, the kiss that Enriquez described, a short peck that barely grazed her skin, is insufficiently abusive to constitute severe harassment by itself.  *See Weiss*, 990 F.2d at 337 (finding no hostile work environment when co-worker, among other advances, attempted to kiss plaintiff once in a bar, and may have twice attempted to kiss her in the office); *Saxton*, 10 F.3d at 534 (stating that an unwanted rubbing of plaintiff's thigh, a forced kiss and an attempted grab by co-worker were not enough to create a hostile work environment).  Accordingly, Welch's behavior toward Enriquez was not objectively hostile.

Significantly, no facts in the record indicate that Welch's conduct towards Enriquez affected her job or altered the conditions of her employment.  She has admitted that each time Welch made a comment about her or a customer, she returned to work and completed her shift without any troubles.  She even admits that she returned to work and completed her shift after Welch attempted to kiss her in his office.  Because the environment at USCC did not affect her job performance or alter

her conditions of employment there, it could not have been a hostile work environment. *See Cerros*, 288 F.3d at 1046 ("[A] court must consider the totality of the circumstances, including . . . whether [the harassment] unreasonably interferes with an employee's work performance."); *Gleason*, 118 F.3d at 1145 ("Title VII is not directed against unpleasantness *per se* but only against discrimination in the conditions of employment."). Because Welch's conduct towards Enriquez was not severe or pervasive, and because it did not alter the conditions of her employment, she cannot establish that an objectively hostile work environment existed. Because she cannot establish that an objectively hostile work environment existed, she cannot state a prima facie case of sex discrimination based on sexual harassment. Accordingly, as a matter of law, USCC is entitled to judgment on Enriquez's sex discrimination claim.

     *ii. Sanchez*

Similar to Enriquez, Sanchez bases her sex discrimination claim on statements that Welch made to her and statements that she heard Welch say about other people. Unlike Enriquez, Sanchez does not complaint of any physical contact by Welch.

Welch made several inappropriate comments to Sanchez between the months of February and March 2006. Welch told Sanchez that she "has a nice ass," that her shirt "looked nice and tight," and he asked to see her breasts approximately eight times, adding "when are you going to let me lick your tits?" on one such occasion. When female customers entered the store, Sanchez often heard Welch say, "damn look at her ass. We need to get her to work here." Additionally, Welch told Sanchez that he "took a bottle of water, and [he] showed [Mullins] the best time of her life."

A limited number of comments directed at a co-worker and other people, including other co-workers and customers may not create an objectively hostile work environment. *See, e.g., Patt v.*

*Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (holding that plaintiff's complaints of eight comments were minor or isolated incidents insufficient to demonstrate an objectively hostile work environment); *Gleason*, 118 F.3d at 1144 (finding comments directed at others do not have the same effect as comments directed at the plaintiff); *cf. Valentine v. City of Chicago*, 452 F.3d 670, 681-82 (7th Cir. 2006) (finding behavior could have created a hostile work environment when co-worker rubbed his crotch in front of the plaintiff every day, asked her on twenty occasions to leave her fiancé, asked her on dates between thirty and forty times, made repeated comments about her "tits and ass," and on six occasions rubbed the plaintiff's shoulder). With respect to Welch's comment to Sanchez about Mullins, the record shows that Sanchez attached different interpretations to that comment. In her deposition, she stated that she understood it to mean that Welch penetrated Mullins with the water bottle. (Pl. 56.1 Resp. ¶ 36.) However, other deposition testimony tends to show that after hearing Welch's comment about the water bottle, Sanchez thought that Welch poured the water from the bottle on Mullins. (*Id.*) Regardless of the meaning that Sanchez actually attached to Welch's comment, the comment concerned Mullins, not Sanchez. Moreover, ambiguous comments that could possibly carry a sexual connotation are not sufficient to create an objectively hostile work environment. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) (finding that teasing, ambiguous comments about bananas and rubber bands, coupled with four incidents of touching the plaintiff's arm or buttocks did not constitute sexual harassment).

Furthermore, in determining whether a hostile work environment existed, as in *Baskerville*, the Court takes note of the things that Welch did not do towards Sanchez. He "never touched the plaintiff. He did not invite her, explicitly or by implication, to have sex with him, or to go out on a

date with him . . . . He did not expose himself, or show her dirty pictures." *Baskerville*, 50 F.3d at 431.

Critically, Welch's behavior towards Sanchez did not alter the conditions of her employment. She admitted that after each incident, she returned to work and completed her shift. Welch's conduct towards her did not interfere with the performance of her job. Because the environment at USCC did not affect her job performance or alter her conditions of employment there, it could not have been a hostile work environment. *See Cerros*, 288 F.3d at 1046 ("[A] court must consider the totality of the circumstances, including . . . whether [the harassment] unreasonably interferes with an employee's work performance."); *Gleason*, 118 F.3d at 1145 (finding that hostile work environment causes of action under Title VII protect against discrimination in the conditions of employment. Sanchez claims that the disagreement between her and Welch over sick time shows that she had to endure an objectively hostile environment at USCC's Bedford Park store. However, that incident has no relation to the harassment that Sanchez claims created a hostile work environment for her, Welch's inappropriate comments to her and others. Nothing in the record ties the dispute over sick time with sexual comments that Welch made. Therefore, Welch's conduct did not alter the conditions of her employment. *See Cerros*, 288 F.3d at 1046. Because Welch's conduct towards Sanchez was not severe or pervasive, and because it did not alter the conditions of her employment, she cannot establish that an objectively hostile work environment existed. Because she cannot establish that an objectively hostile work environment existed, she cannot state a prima facie case of sex discrimination based on sexual harassment. Accordingly, as a matter of law, USCC is entitled to judgment on Sanchez's sex discrimination claim.

### iii. Skopis

Skopis claims that she experienced a hostile work environment at USCC based upon Welch's advances, comments that he made about customers inside the store, and the physical contact he made with her at the USCC Christmas party.

Beginning November 2005, Welch made several advances towards Skopis. First, he told Skopis that she was pretty. After that, he called her into his office to tell her that he wanted to go out for drinks with her so that he could get her drunk and take advantage of her. In December 2005, when she volunteered to "do anything around here" if she could leave early that day, Welch responded "So what do you mean by anything? Are you serious when you say anything, you will do anything?" In January 2006, Welch sent Skopis several text messages telling her that she "had a bad boy for a boss," that he "was going to get himself into trouble for talking to [Skopis] like that," and that he "liked it when she wore her hair down because that does it for him." Oftentimes, when an attractive female customer walked into the store, Skopis overheard Welch say, "Wow, look at her. She is pretty. Look at her body. Get her an application." At the USCC Christmas party, when Skopis sat on the edge of a pool table, Welch approached her, pushed her legs open, and picked her up to dance, holding her with her legs around his waist for approximately thirty seconds until he let her down.

Making a few advances towards a co-worker, making inappropriate comments about customers and one instance of brief contact may not create a hostile work environment. *See, e.g., Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645-46 (7th Cir. 2005) (no hostile work environment when male supervisor invited female employee on two occasions to join him on his boat for "a weekend of drinking and other things" and made sexual comments to co-workers outside of plaintiff's

presence); *Weiss*, 990 F.2d at 337 (no hostile work environment where co-worker asked plaintiff for dates on repeated occasions, placed "I love you" signs in her work area, and attempted to kiss her on multiple occasions); *Baskerville*, 50 F.3d at 428 (no hostile work environment when plaintiff's supervisor called the plaintiff a "pretty girl," made grunting sounds when she wore a leather skirt, said to the plaintiff that his office was not hot "until you walked in here," and stated that all pretty girls should run around the office naked).

With respect to the contact between Welch and Skopis at the Christmas party, typically, "[t]he mere existence of physical contact does not create a hostile environment." *Patton*, 455 F.3d at 816. "Even more intimate or more crude physical acts – a hand on the thigh, a kiss on the lips, a pinch of the buttocks – may be considered insufficiently abusive to be described as 'severe' when they occur in isolation." *Hostetler*, 218 F.3d at 808. Nonetheless, one incident of physical contact can create a hostile work environment if the contact is "direct contact with an intimate body part." *Patton*, 455 F.3d at 817. Here, Skopis admits that the contact from Welch lasted for a short period of time, and that it only occurred once. The single, isolated incident between Skopis and Welch at the Christmas party was not the type of contact that can create a hostile work environment by itself. *See id.* ( single contact where co-worker "ran his hand all the way up [plaintiff's] inner thigh, under her shorts until he toucher her underwear" sufficient to create a hostile work environment); *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001) (that touching plaintiff's "breast near the nipple for several seconds is severe enough" to constitute a hostile environment by itself).

Furthermore, Welch's conduct towards Skopis did not alter the conditions of her employment. She admitted that after each incident, she returned to work and completed her shift. Skopis argues that she did not receive a transfer into a sales position because she rejected Welch's advances.

However, Skopis has admitted that she never submitted an approved internal application for the position, which USCC requires for internal promotions and transfers. Therefore, Welch's behavior towards her did not alter the conditions of her employment, because her failure to submit the proper paperwork for the sales position prevented her from obtaining the transfer. No facts in the record indicate that Welch's conduct towards Skopis affected her job performance or altered the conditions of her employment. *See Cerros*, 288 F.3d at 1046 ("[A] court must consider the totality of the circumstances, including . . . whether [the harassment] unreasonably interferes with an employee's work performance."); *Gleason*, 118 F.3d at 1145 (finding that hostile work environment causes of action under Title VII protect against discrimination in the conditions of employment). Because Welch's conduct towards Skopis was not severe or pervasive, and because it did not alter the conditions of her employment, she cannot establish that an objectively hostile work environment existed. Because she cannot establish that an objectively hostile work environment existed, she cannot state a prima facie case of sex discrimination based on sexual harassment. Accordingly, as a matter of law, USCC is entitled to judgment on Skopis's sex discrimination claim.

### iv. Mullins

Mullins claims that she experienced a hostile work environment because Welch asked her for dates on approximate three or four occasions, he possessed of nude photographs of her, he attempted to kiss her twice in his office, and two occasions when Welch lifted by the outside of her thighs and called her "juicy."

"In order to be actionable under Title VII, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d

662, 668 (7th Cir. 2001). The record here shows that Mullins did not find some of Welch's advances to be subjectively hostile. Although she claims that Welch began harassing her in October 2005, she gave him a Valentine's Day present in February 2006. Around that same time, he sent her a text message telling her, "Let's elope to the Bahamas." She admitted that she found that message to be funny rather than hostile or abusive. Moreover, the record reflects that Mullins participated in the sexual atmosphere that existed among many employees at USCC's Bedford Park store. She exchanged text messages with her co-workers that included images of cartoon characters engaging in sex acts, and she stated that those images did not offend her. Additionally, Mullins share pictures of herself with her co-workers, including photographs of Mullins nude, as well as pictures featuring her wearing lingerie. Although she claims that she did not share the images with Welch, he somehow obtained copies of the pictures. Mullins's actions show that at least some of the events that provide the basis for her sex discrimination claim did not subjectively create a hostile or abusive environment for her because found some of Welch's actions to be funy and because she voluntarily participated in some of the sexual joking that occurred between USCC's Bedford Park employees.

Even if Mullins found Welch's behavior to be subjectively offensive, asking a co-worker to go out on a date three or four times over the course of six months, attempting to kiss her twice and making physical contact on two isolated occasions does not necessarily create an objectively hostile work environment. *See, e.g., Weiss*, 990 F.2d at 337 (no objectively hostile work environment where co-worker asked plaintiff for dates on repeated occasions, placed "I love you" signs in her work area, and attempted to kiss her on multiple occasions); *Adusumilli*, 164 F.3d at 361-62 (finding four isolated incidents where a co-worker briefly touched the plaintiff's buttocks did not constitute sexual harassment); *cf. Patton*, 455 F.3d at 817 (finding that single contact where co-worker "ran his hand

all the way up [plaintiff's] inner thigh, under her shorts until he touched her underwear" constituted a hostile work environment by itself).

Furthermore, the record does not suggest that Welch's behavior towards Mullins altered the conditions of her employment. Because the environment at USCC did not affect her job performance or alter her conditions of employment there, it could not have been a hostile work environment. *See Cerros*, 288 F.3d at 1046 ("[A] court must consider the totality of the circumstances, including . . . whether [the harassment] unreasonably interferes with an employee's work performance."); *Gleason*, 118 F.3d at 1145 (finding that hostile work environment causes of action under Title VII protect against discrimination in the conditions of employment). Because Welch's conduct toward Mullins was not severe or pervasive, and because it did not alter the conditions of her employment, she cannot establish that an objectively hostile work environment existed. Because she cannot establish that an objectively hostile work environment existed, she cannot state a prima facie case of sex discrimination based on sexual harassment. Accordingly, as a matter of law, USCC is entitled to judgment on Mullins's sex discrimination claim.

### B. Retaliation

In addition to their sex discrimination claims, Plaintiffs all brought retaliation claims against USCC under Title VII. To state a claim for retaliation, a plaintiff may proceed under the direct method or the indirect method. *See Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504. Under the direct method, a plaintiff must submit direct or circumstantial evidence that the employer made an employment decision based upon an improper motive under Title VII. *See id.* Because Plaintiffs do not offer direct evidence of discrimination or even circumstantial evidence that would allow a jury to infer intentional discrimination by USCC, they must proceed under the indirect method.

Under the indirect method of proof, the plaintiff must first establish a prima facie case of retaliation "by proving that she 1) engaged in statutorily protected activity; 2) met her employer's legitimate expectations; 3) suffered an adverse employment action; and 4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008). To engage in statutorily protected activity, the plaintiff must have a genuine belief that she suffered harassment, and actually oppose the sexual harassment by communicating that good faith belief to the employer. *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 375 (7th Cir. 2007). "For purposes of Title VII, an adverse employment action is a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits." *Rhodes*, 359 F.3d at 504. An adverse employment action "is something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.*

Skopis and Mullins cannot make prima facie cases of retaliation because the record does not indicate that they suffered any adverse employment action after engaging in protected activity. Rather, their complained-of employment actions occurred before they reported Welch's behavior. "It is axiomatic that a plaintiff must engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity." *Durkin v. City of Chicago*, 341 F.3d 606, 614-615 (7th Cir. 2003) ("An employer cannot retaliate if there is nothing for it to retaliate

against."). Skopis and Mullins each claim retaliation for events that occurred before April 2, 2006, the date they first reported Welch's behavior to USCC's Human Resources department.[4]

Skopis claims that USCC retaliated against her when Welch changed her schedule after she rejected his advances. In December 2005 or January 2006, after the schedule change, Skopis had to work nights and close the Bedford Park store at the end of her shift. The schedule changes that Skopis experienced could not have been retaliation for engaging in statutorily protected activity, because the schedule change occurred a full four months before she engaged in any protected activity. Additionally, even if the schedule change occurred after she reported Welch's behavior, because Skopis admitted that all employees at the Bedford Park store had their schedules changed, and that all employees had to work nights or weekends at some point, she would not be able to show that USCC treated her differently than other employees. Therefore, Skopis cannot make a prima facie showing of retaliation. Accordingly, as a matter of law, USCC is entitled to judgment on her retaliation claim.

Mullins claims that USCC retaliated against her when Welch told her that she was fired for wearing her USCC-issued Chicago White Sox shirt to work one day. While the record does not reveal the actual date of this incident, the record reflects that it occurred before any of the Plaintiffs reported Welch's behavior internally on April 2, 2006. Accordingly, that incident cannot provide the basis for her retaliation claim, because it occurred before she engaged in statutorily protected activity.

---

[4] In their briefs, Enriquez and Skopis argue that certain events that occurred after April 2, 2006 constitute retaliation against them. Specifically, Enriquez argues that she received a written warning for missing a meeting regarding USCC's Project Everest in June 2006. Skopis argues that USCC terminated her on August 2, 2006 in retaliation for reporting Welch. While those events occurred after they reported Welch's behavior to USCC, those events are not a part of the lawsuit before this Court, and their attempts to raise those issues at this point blatantly disregard Judge Filip's Order entered April 5, 2007 that denied them leave to file a Third Amended Complaint to include claims arising from those events. Additionally, the Court notes that Skopis has a separate case currently pending against USCC in this District to raise the issue of retaliatory discharge (07 C 2908, before Judge Shadur). Accordingly, the Court will not consider Enriquez's written warning or Skopis's termination when analyzing their retaliation claims.

Moreover, even if that incident occurred after she engaged in protected activity, it would not have amounted to an adverse employment action. Although Welch told her that she was fired, she did not actually lose her job over the incident. In fact, Welch informed Mullins that she was not fired immediately after he initially told her that she was fired. Therefore, Mullins cannot make a prima facie showing of retaliation. Accordingly, as a matter of law, USCC is entitled to judgment on her retaliation claim.

The Court now turns to the retaliation claims of Enriquez and Sanchez.

### i. Enriquez

Enriquez bases her retaliation claim on rumors that arose around the workplace after USCC terminated Welch. At that time, she overheard one co-worker tell another co-worker, "those bitches got Clayton [Welch] fired." However, "[n]ot everything that makes an employee unhappy qualifies as an adverse action for Title VII purposes." *Rhodes*, 359 F.3d at 505. Typically, Title VII protects employees from serious consequences that can arise from reporting harassment, including "termination of employment, a demotion evidenced by a decrease in salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002). However, "an adverse employment action might occur when an employer orders its employees to shun plaintiff, provided that this activity causes material harm to plaintiff." *Id.* at 788-89 (*quoting Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998)).

Nothing in the record supports a finding that USCC ordered its employees in Bedford Park to shun Enriquez or make comments to her about reporting Welch. Furthermore, even if USCC did order its employees to blame Enriquez and the other Plaintiffs for Welch's termination, nothing in

the record indicates that she experienced material harm as a result. The record does not contain any facts that would create a triable question about whether her co-worker's comment caused material harm to Enriquez's employment at USCC. While Enriquez undoubtedly found the comment unpleasant, it constitutes a mere inconvenience, and not an adverse employment action. As a matter of law, Enriquez cannot establish that the unpleasantness she experienced from co-workers after reporting Welch's behavior to USCC constituted an adverse employment action. Because Enriquez cannot establish an adverse employment action, she cannot make a prima facie showing of retaliation. Accordingly, as a matter of law, USCC is entitled to judgment on her retaliation claim.

> ii. *Sanchez*

Sanchez bases her retaliation claim on several incidents that occurred after she reported Welch's behavior on April 2, 2006. She argues that USCC retaliated against her when it transferred her to its Crestwood retail store on April 25, 2006, reduced her employment status to part-time, and eliminated her insurance benefits.

With respect to the change in her employment status and loss of benefits, Sanchez admits that USCC "straightened out" the situation and that she "never lost anything in terms of insurance." Furthermore, she admits that the situation "didn't affect her in any way" and that she "suffered no harm" as a result. The record does not reflect that Sanchez actually lost her employment status or benefits. Rather, while the computer system reflected her status as part-time, the record reflects that she continued to work at USCC on a full-time basis. A demotion or material loss in benefits can constitute an adverse employment action under Title VII. *See id.* at 788. However, the record in this case does not reflect that Sanchez experienced a demotion or a material loss of benefits. Rather, the record shows a computer error that amounts to a mere inconvenience, not an adverse employment

action.  Sanchez admits that the computer error did not affect her, that she continued to work as a full-time employee even though the computer system listed her as a part-time employee, and that she never lost any insurance coverage.  Because she suffered no harm, she did not experience an adverse employment action based upon the incorrect record of her employment in the computer system.

With respect to Sanchez's transfer to the Crestwood store, a transfer can constitute an adverse employment action.  A purely lateral transfer, "a transfer that does not involve a demotion in form or substance" does not constitute an adverse employment action.  *Maclin v. SBC Ameritech, Inc.*, 520 F.3d 781, 788 (7th Cir. 2008).  "Neither does a transfer involving no reduction in pay and no more than a minor change in working conditions qualify as an adverse action."  *Id.*  A lateral transfer becomes actionable under Title VII when "a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted."  *Id.* at 787-88.  The record contains no facts that would suggest that Sanchez's transfer to Crestwood constituted an adverse employment action.  Upon her transfer to Crestwood, she held the same position (despite what the USCC computer system said), and nothing in the record indicates that she incurred a reduction in pay after the transfer.  Moreover, the record contains nothing to suggest that the transfer to Crestwood reduced Sanchez's career prospects.  Finally, Sanchez only worked in the Crestwood store for approximately three months, because in June 2006, she received the transfer to USCC's Oak Lawn store that she had previously requested.  Therefore, the transfer to USCC's Crestwood location did not constitute an adverse employment action for Sanchez.  Because Sanchez cannot establish an adverse employment action, she cannot make a prima facie showing of retaliation. Accordingly, as a matter of law, USCC is entitled to judgment on her retaliation claim.

III.  Sanchez's IIED Claim

In addition to her Title VII claims, Sanchez filed an IIED claim against Welch and USCC. Welch argues that that the Illinois Human Rights Act ("IHRA") preempts her IIED claim.

The IHRA gives the Illinois Human Rights Commission (the "IHRC") exclusive jurisdiction over civil rights violations.  *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 602 (7th Cir. 2006) *quoting* 775 ILCS 5/8-111(D) ("Except as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act."). Under the IHRA, sexual harassment by "any employer, employee [or] agent of any employer" is a civil rights violation.  775 ILCS 5/2-102(D).

The Illinois Supreme Court has addressed IHRA preemption on two occasions.  In *Geise v. Phoenix Co. of Chicago, Inc.*, 639 N.E.2d 1273, 1277 (Ill. 1994), the Illinois Supreme Court held that the IHRA preempted the plaintiff's claims for negligent hiring and retention because they "depend[ed] on the prohibitions against sexual harassment for their viability" and, as such, were "inextricably linked" to the concept of that particular civil rights violation.  In a later case, the Illinois Supreme Court held that the plaintiff's claims of assault, battery and false imprisonment were not "inextricably linked" with claims of sexual harassment because the plaintiff could establish "the necessary elements of each tort independent of any legal duties created by the Act."  *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 22 (Ill. 1997).

Therefore, "the IHRA does not preclude courts from exercising jurisdiction over all tort claims factually related to incidents of sexual harassment."  *Naeem*, 444 F.3d at 602.  Rather, if a plaintiff can establish the necessary elements of a tort independent of any legal duties created by the IHRA, then the IHRA does not preempt the plaintiff's tort claim.  *Id.* at 602-03; *see also Krocka v.*

*City of Chicago*, 203 F.3d 507, 516-17 (7th Cir. 2000) ("[W]here a course of conduct states an independent state law claim, that independent claim is not preempted by the IHRA. That is, if the conduct would be actionable even aside from its character as a civil rights violation because the IHRA did not 'furnish the legal duty that the defendant was alleged to have breached,' the IHRA does not preempt a state law claim seeking recovery for it."). However, the Seventh Circuit has repeatedly held that the IHRA preempts common law claims for IIED when the plaintiff bases the IIED claim solely on incidents of sexual harassment. *See Quantock v. Shared Mktg. Servs.*, 312 F.3d 899, 902 (7th Cir. 2002) (per curium) (finding IIED claim preempted by the IHRA because it "depend[ed] on allegations of sexual harassment" when IIED claim centered on conduct of co-worker who propositioned her, grabbed her breasts and forcibly kissed her); *Smith v. Chicago Sch. Reform Bd. of Trs.*, 165 F.3d 1142, 1151 (7th Cir. 1999) (holding IIED claim preempted when "the core of [plaintiff's IIED] theory" was that plaintiff was a victim of harassment); *accord Naeem*, 444 F.3d at 605 (finding IHRA did not preempt IIED claim when the conduct plaintiff alleged "is not just sexually harassing conduct; instead, [plaintiff] alleges a pattern of behavior by the defendants that created impossible deadlines, set up obstacles to her performing her job, and sabotaged her work . . . . [I]t is clear that her claim rests not just on behavior that is sexually harassing, but rather behavior that would be a tort no matter what the motives of the defendant.").

Here, as in *Quantock* and *Smith*, Sanchez bases her IIED claim entirely on Welch's behavior that formed the basis of her sex discrimination claim. Unlike *Naeem*, the facts here do not show that Welch engaged in behavior, other than the alleged harassment, that could constitute IIED. In her brief, Sanchez claims that her IIED claim arises independently of the legal duties imposed by the IHRA. However, the facts do not show that Welch's behavior violated any other legal duties.

Rather, in her IIED claim, she reiterates the same facts that formed the basis of her hostile work environment claim under Title VII. The record does not support a finding that her IIED arises from a different legal duty than her sex discrimination claim. Accordingly, she has shown that her IIED claim depends entirely on her sex discrimination claim. Therefore, the IHRA preempts her IIED claim because the core of her IIED theory is that Welch subjected her to a hostile work environment. Because the IHRA preempts her IIED claim, as a matter of law, Welch and USCC are entitled to summary judgment on Sanchez's claim for IIED.

## CONCLUSION AND ORDER

For the reasons stated, USSC's and Welch's motions for summary judgment are granted. So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: November 14, 2008